NATIONAL UNION FIRE INSURANCE COMPANY *v.* DICKINSON, AUDITOR.

Opinion delivered April 9, 1917.

1. INSURANCE—FIRE INSURANCE—CHARACTER OF THE BUSINESS.—The fire insurance business is subject to franchise and police regulation, but it is not of so public a nature that the public can demand from fire insurance companies the same service as it may demand of purely quasi-public corporations or agencies.

2. MONOPOLIES—INSURANCE—AGREEMENT IN RESTRAINT OF TRADE.—An agreement between certain members acting under Act of 1913, p. 675, creating the Actuarial Bureau, which would result in favoring certain fire insurance companies and working to the detriment of others, would be subject to equity jurisdiction at the instance of the attorney general, or an aggrieved company, to restrain the operation of such agreement.

3. INSURANCE—FOREIGN INSURANCE COMPANIES—CONTROL OF BY STATE.—Foreign insurance companies, under Kirby's Digest, § 4345, are authorized to do business in the State only upon the doing of

certain required things, and are creatures of the State, and cannot individually or collectively, do acts affecting injuriously the public interest, or the interest of other insurance companies authorized to do business in this State.

4.    INSURANCE—FIRE INSURANCE—ACTUARIAL BUREAU—RATES.—The Arkansas Actuarial Bureau, was organized under Acts 1913, p. 675, its business being the fixing of rates in the State. *Held,* the bureau's method of assessing fire insurance companies for its support was not arbitrary or unreasonable.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Hill, Fitzhugh & Brizzolara,* for appellant.

1.    Fire insurance is a *quasi*-public business subject to regulation by legislation and courts.

2.    Such regulation must be reasonable. Act 159 is an adoption by this State of a policy of regulating fire insurance and unreasonably applied it tends to create a monopoly.

3.    Plaintiff is entitled to membership in the Actuarial Bureau upon complying with the reasonable regulation thereof, and the bureau is not the judge of what a reasonable regulation is, but the courts. The second assessment is unreasonable and arbitrary. 197 Fed. 435; 184 Ill. 438; 48 L. R. A. 568; 76 N. E. 100; 3 L. R. A. (N. S.) 153; 32 Hun. (N. Y.) 4; 42 *Id.* 454; 127 Ill. 152; 2 L. R. A. 410; 74 N. J. Eq. 372; 29 L. R. A. (N. S.) 1194; 2 Wyman on Publ. Service Corp., secs. 865, 1401; 73 Ark. 205.

*Cockrill & Armistead,* for appellees.

1.    The chancery court has no jurisdiction. 197 Fed. 435, and others.

2.    The bureau is a public agency established by law, and the sole question is whether the methods and rules are uniform and not discriminatory. 21 A. & E. Enc. 808, 924; 207 U. S. 251; 92 Ark. 1; 93 *Id.* 612; 85 *Id.* 464; 102 *Id.* 205; 25 Cyc. 608; 22 *Id.* 1390; 94 Ill. 364; 50 S. W. 35; 93 N. Y. 313; 40 N. E. 967; 48 *Id.* 682.

3.    The bureau's method is neither arbitrary nor discriminatory. It is fair and reasonable.

STATEMENT BY THE COURT.

In 1913 the General Assembly passed an act, the second section of which provides: "All companies, corporations or associations authorized to transact business of insurance in this State shall file with the Auditor or Insurance Commissioner, a schedule of rates of premiums to be charged and collected therefor, on contracts of insurance or indemnity proposed to be affected by said company, corporation or association, which, in all cases, shall be a fixed percentage of the amount insured, and such companies, corporations and associations may employ a common expert to inspect individual risks and advise the premium to be charged in accordance with schedule of rates on file with the Auditor or Insurance Commissioner, and such premiums shall be uniform for all risks rated under the same schedule." Acts 1913, Act 675.

The act contained other provisions that are not material to this controversy. Section 5 of the act provides a penalty for a failure to comply with its provisions, and authorizes the Auditor or Insurance Commissioner to suspend the authority of any company to transact business until after it has complied with the conditions of the act.

Nearly all of the insurance companies doing business in Arkansas entered into an organization which they designated "The Arkansas Actuarial Bureau" (hereafter, for convenience, called "Bureau"), and employed J. S. Speed as the local manager thereof.

The bureau was under the supervision of a committee of seven of the managing officials of seven of the leading companies that were doing business in the State. The members of this committee resided at the headquarters of their respective companies in the East. This committee was assisted by a local advisory committee of nine members, who were general and special agents representing the original companies who organizd the bureau. After about a year, the advisory committee was

abolished and the entire supervision devolved upon what is called the Eastern or "New York" committee.

Under the plan of the organization, the companies of the bureau employed Speed as their common expert to inspect individual risks and advise the premiums to be charged, in accordance with the schedule of rates filed with the Insurance Commissioner. Such premiums, under the act, had to be uniform for all risks rated under the same schedule.

Appellant was one of the members of the bureau, and by its power of attorney authorized Speed to act for it, and to file with the Auditor its schedule of rates of premiums as required by the law under which the bureau was organized.

The bureau first adopted as a basis schedule for fixing the rates a system known as "Dean's Analytical Schedule." Originally there were filed with the Auditor for the companies, thirty-seven schedules, and subsequently eight special schedules. Schedule 26 was divided into two parts. One is the charges and credits, terms, privileges, riders and conditions affecting the cost of fire, lightning and windstorm insurance, and the other contained an abstract of general basis schedules for making relative estimates of fire insurance in the unprotected towns and localities where no specific estimates have been publishd by the bureau. The local agents make rates under this schedule.

The bureau entered upon the work of inspecting individual properties with a view of fixing individual rates of insurance. The principal part of the expense of the bureau was in making inspections of individual risks, and rating same in accordance with the basis schedule, in keeping an individual account of risks, and issuing schedules. The expenses of the bureau were about $75,000 for the first year, $50,000 for the second year, and $35,000 for the third year. These expenses are borne by the companies who constitute the bureau.

Speed, the manager, acting under the directions of his supervisory committee, on May 1, 1913, levied an assessment of one per cent. based on the net premiums reported to the Auditor for the year 1912, amounting to $103,647.61, except on farm, marine, tornado, steam railway and bale cotton contracts, which amounted to $60,-041.27, and reduced the net premiums to $43,606.34. The appellant paid one per cent. of this sum, amounting to $436.06, without protest. After the bureau had been in operation about three months, it levied a second assessment of one per cent. on the total premiums on all business done in the State, towit, $103,647.61, without making any deductions or exceptions for farm or other special kinds of insurance. This assessment amounted to $1,036.47. The appellant thereupon, by letter, inquired of the bureau as to why the second assessment should not be based on the same conditions as the first, and the bureau answered that the change was made by reason of the fact that the very large percentage of deductions under the first assessment demonstrated that unless the change was made, the usefulness of the bureau would be seriously crippled or the percentage of the assessment would be unreasonably high. The appellant responded to this, saying that the proposed assessment, without excluding the farm and other special kinds of insurance, as was done under the first assessment, was not equitable in view of the fact that the premiums on the other kinds of insurance do not come within the scope of the bureau, and should have no bearing in determining the rate of the assessment. Appellant stated that the rate of assessment should be increased, as the companies would then bear their relative proportion of the burden, based on the services actually performed, and that this was the only method that could be adopted without discriminating against the interested companies. The appellant enclosed a check for $436.06, instead of the amount levied by the committee of the bureau. Speed accepted this check subject to the action of the Arkansas Supervisory Committee in New York.

This led to further correspondence between the bureau and appellant, in which the appellant insisted that the report of the bureau showed, and that it was a fact, that the actual services performed by the bureau were in connection with ratings on town and manufacturing property only, and that therefore the assessments should be based alone upon premiums on such property. Or, in other words, that the assessments should be based on premiums on such classes of risks as actually required the services of the bureau; that this fact was recognized in the first assessment by excluding therefrom premiums on tornado, farm, steam railway, and per bale cotton contract insurance.

The bureau, on the other hand, insisted that all these classes of insurance were within the scope of the bureau, and that it was necessary to include these in the second assessment because the deductions made by the various companies under the first assessment plan had been so heavy that the bureau could not secure the necessary funds to carry on its work; that accordingly, the bureau had made the assessment upon the net premiums as reported to the Auditor of State, upon various classes of insurance transacted by the subscribers to the bureau; that the burden had been equally as heavy, in proportion to the services rendered, on the other members of the bureau, and that all had paid the assessment without objection except the appellant. The bureau insisted that it was not the intention of the supervisory committee to make assessments for the operation of the bureau on the basis of the second assessment, but to continue to make deductions along the line of the first assessment, and that it was on account of the heavy cost of the organization that all interests were called upon to contribute to pay for the work.

It stated in one of its letters, in substance, that if it recognized appellant's protest, and should exempt from the assessment the classes of insurance that appellant insisted on that such a course would result in confusion and

uncertainty respecting the means of support for the bureau to such an extent as to make it impracticable to carry on the work at all. In this letter the bureau directed attention to the fact that it was called on very slightly, if at all, to devote attention to many other classifications, such as dwellings, cotton gins, cross-road stores, schools, churches, etc., but that the other subscribers, who wrote heavily on such classes of insurance, had contributed on the uniform basis of assessment on their whole premiums; that if the bureau should eliminate the assessment on premiums upon the classes of insurance insisted upon by appellant other companies. writing other classes of insurance would also object to paying their proportion of the expenses of the bureau on the plea that they did not write business in certain towns and localities, and should not be called upon to contribute toward the expense of inspecting and estimating rates in places where those companies maintained no agencies; that therefore the insistence of the appellant would lead to discriminatory methods that would result in conceding to some individual subscribers more advantageous terms than the uniform assessment as prescribed by the committee. The bureau concluded this letter by stating that it would be unable to extend the services of the bureau to any company refusing to pay according to the assessment adopted, and its manager would decline to act as the delegated expert or adviser of such company and leave it to make its own arrangement for compliance with the law other than through the medium of the bureau.

In one of its letters the appellant reminded the bureau that it had acted upon the latter's suggestion and had incurred the expense of printing and publishing the rates of insurance on tornado risks and farm property, and that the bureau had been put to no expense in connection with its farm rate schedules except such fee as may have been necessary for filing them with the Insurance Commissioner. In this letter appellant states: "After reviewing the case, we think you will agree that

it would be entirely inequitable to request the National Union to pay a heavy expense to the bureau on premiums on farm insurance, when, in the circumstances, the bureau was subject to practically no expense in that connection so far as this company is concerned.''

In answer to this, the bureau stated that it had to publish the schedules because agents of other companies wanted them for comparison.

In one of its letters appellant called attention to the fact that the increase in the assessment against which it protested amounted to 137.7 per cent., and asked what the average increase of this assessment was upon the other companies, and in reply to this the bureau stated that the average increase in assessment on the other companies was about 20 per cent. The appellant, in answer to this, stated that the average increase over the first assessment on the other companies being only 20 per cent. confirmed its opinion that the basis upon which the second assessment was levied was unfair to and discriminatory against appellant. In this letter appellant enclosed its check for $87.21, representing its share of the average increase, and notified the bureau that if it insisted on withdrawing its services from appellant that the latter would take steps to protect its rights.

The bureau, in another letter, called attention to the fact that other companies had paid their assessment on tornado premiums, and that many had paid far in excess of the amount returned by the appellant. In answer to this, appellant replied that on tornado premiums covering farm property it could not be assessed, inasmuch as it had filed and distributed its own rates on all farm business, both fire and tornado, in accordance with its rights under the law, and the bureau was subject to no expense in connection with the farm insurance business of appellant.

Speed then notified appellant that it was necessary for him to resign his power of attorney as its agent.

In the last letter written to Speed, the appellant, among other things, says: "The principle involved for which we have all along been contending remains unchanged, namely, that the company could not be assessed in connection with farm business by reason of the fact that the bureau was under no expense in connection with this class, and that consequently the present mode of apportioning expense is incorrect and discriminatory, and that if the percentage of assessment to meet the outlay of the bureau is insufficient for its needs, the ratio of assessment should be accordingly increased. This company would, of course, have no objection whatever to meeting its pro rata of the expense so calculated, even if the increase was considerable."

Speed answered this, stating that no exception could be made in favor of appellant.

The bureau, through its manager, Speed, notified appellant's agents that appellant was no longer a subscriber to the bureau, and thereafter not to use any information or supplies which emanated from the bureau in the transaction of the business of appellant. The Auditor, as Insurance Commissioner, notified appellant that it was not complying with the act of 1913 in the filing of its schedules of rates on urban property; that only a schedule of rates on farm property had been filed, and that it would be necessary for it to file its rates on other classes of property in order to comply with the act of 1913.

Appellant then instituted this suit against the Auditor, as Insurance Commissioner, and J. S. Speed. It alleged, among other things, that it was the duty of the bureau and the common expert employed by it to serve all insurance companies desiring to do business in Arkansas on similar terms; but that the bureau, utilizing the common expert, is conducting its business by making arbitrary rules which will operate to exclude companies from doing business in the State unless they pay excessive and discriminatory assessments to become members thereof; that appellant was the only company doing a

farm insurance business direct, and that it did the same on the installment plan, and not through its urban agents; that the rules of the actuarial bureau required the appellant to pay assessments of approximately $1,200 a year in addition to what it would be required to pay on its urban business, and therefore this was a discriminatory charge against appellant for the benefit of companies doing urban business, since practically all of the expenses of the bureau were incurred in urban business; that appellant insisted that it had the right to be a member of the bureau and to have the benefit of its services upon the payment of one per cent. assessment upon all of its premiums except its farm insurance, which it had offered to pay, and also any other proper assessment charged against it, to continue its membership in the bureau; that the appellant had filed its own schedule of rates on farm insurance, and made its own inspection, and had never asked nor desired any services or information from the bureau on its farm business; but the bureau was exacting of appellant a charge of approximately $1,200 a year more than its just proportion of the expenses of maintaining the bureau in order that appellant may obtain the information and estimates made by the bureau which are essential to enable appellant to conduct an urban insurance business; that this arbitrary rule adopted by the bureau requires the appellant to pay more than $2 to $1 paid by the companies doing an exclusive urban business in order to obtain the services of the bureau. Appellant prayed that the Auditor be enjoined from ousting it from doing business in the State, and that he be required to issue licenses to the agents of appellant, and that Speed, as manager of the bureau, be enjoined from maintaining arbitrary and unreasonable rules as conditions of membership in the bureau, and be enjoined from excluding appellant as a member thereof.

Speed answered, denying all of the material allegations of the complaint, and setting up substantially, among other things, that out of the eighty-five companies

represented by Speed, appellant alone had complained of the method of assessment; that the method was as fair, equitable and uniform to all companies as can be conceived; that no method will fail to cause some companies to contribute proportionally a little more than for services actually rendered; that the assessment can not be made with mathematical nicety so that it will not result in some inequality somewhere; that it rests upon a reasonable basis, is not essentially arbitrary, and is the exercise of a fair discretion, even if said bureau be regarded as a public service bureau or an agency of the State; that the assessment was made in good faith with no view of discriminating against or unduly charging appellant, and has been affirmatively approved by all of the members of the bureau except appellant; that he is willing to represent appellant as its agent or attorney in fact on the same terms and conditions applying to all other subscribing companies, *i. e.,* an assessment based on the net premiums for the year 1914-1915 reported to the Auditor, but that he was unwilling and refused to make any exceptions of appellant, or to change the entire plan of assessment, and endanger the continuance of the bureau because of the unwarranted dissatisfaction of one company.

The court dismissed the appellant's complaint for want of equity. From that decree this appeal comes. Other facts stated in the opinion.

WOOD, J., (after stating the facts). (1) I. The business of fire insurance so affects the public interest that it is generally held to be a proper subject-matter for franchise and police regulation by the State. Generally speaking, fire insurance is regarded as a commercial necessity. 14 R. C. L. 857, sec. 25. See *Citizens Ins. Co.* v. *Clay,* 197 Fed. Rep. 435; *McCarter, Attorney General,* v. *Fire Ins. Co.,* 74 N. J. Eq. 372, 18 Ann. Cas. 1048. The public are so largely affected by it that the State undertakes to supervise the business by prescribing the conditions upon which it may be done. But while the business is impressed with a public use, and is therefore of a *quasi-*

public character and subject to license and regulation, it is not so entirely of a public nature that the public have a right to demand service of the companies authorized to do business in the State as they may do of purely *quasi-* public corporations or agencies.

(2)    If the majority of the members of the bureau, through its governing committees or its manager, should undertake to formulate rules, as conditions precedent to membership therein, that would have the effect to eliminate competition and create a monopoly of the insurance business by certain favored companies to the prejudice of the public seeking insurance, or to the detriment of other insurance companies authorized to do business in the State, it would undoubtedly be within the jurisdiction of a court of equity, at the instance of the Attorney General, or other insurance company injuriously affected by such conduct on the part of the bureau, to restrain the making or the enforcement of such rules. This the courts would have the power to do, not because the statute authorizing the creation of the bureau constitutes the same a public agency, but upon the broad ground of public policy and the power of the court to inhibit companies doing an insurance business from conducting such business in such a manner as to injuriously affect the public.

(3)    Since insurance companies are only authorized to do business in the State upon the certificate of the Auditor that they have complied with all the laws affecting them, they are creatures of the State. Kirby's Digest, sec. 4345. Hence the companies constituting the bureau must conform to the laws and the general policy of the State and do no act, either individually or in concert, that has a tendency to injuriously affect the public or the interest of any other insurance company that is authorized to transact business in the State. See *Inter-Ocean Pub. Co.* v. *Associated Press,* 184 Ill. 438, 56 N. E. 822, 48 L. R. A. 568; *Western Union Tel. Co.* v. *State,* 76 N. E. 100.

Therefore, if appellant has shown that the bureau is conducted by its manager or governing committees under

such arbitrary rules as to exclude from the State companies engaged in the dual business of urban and farm insurance, and in a manner to create a monopoly in favor of the other insurance companies and to the exclusion of appellant, as alleged in its complaint, then appellant would be entitled to the relief sought, whether the bureau, under the act, be treated as the mere private agency of its constituent members or as a *quasi*-public agency under whose rules and regulations the business of insurance shall be conducted.

II.  This brings us to the consideration of the question as to whether the rules adopted by the bureau for assessing its members to meet the expenses incident to maintaining the same are so arbitrary and unreasonable as to unjustly discriminate against appellant in favor of other companies, and to virtually preclude appellant from enjoying the benefits of the bureau, and by so doing to practically preclude it from doing business in the State on the same or equal terms with other companies.  The contentions of the respective parties on this issue and the facts mainly relating thereto are reflected in the correspondence set forth in the statement.

It will be observed that the act under which the bureau was organized does not prescribe any rules for assessing its members to meet the expenses of maintaining the organization.  So far as any statutory limitations are concerned, the bureau is left entirely free to adopt its own rules.  The purpose of this statute, as all other insurance laws, primarily, is to protect the public who are seeking insurance, and not to confer any private advantage or benefit upon companies doing an insurance business disconnected with the interests of the public.

It was shown that these bureaus are created in most of the States of the Union, the purpose of such organizations being to place the business of fire insurance on a scientific basis, so that the premiums might be fixed according to the actual risks undertaken, and by thus making rates commensurate with the true hazards  the design

was that the public should get the benefit of reduced rates growing out of a scientific and systematic conduct of the business.

Several of the States, in 1915, adopted the recommendation of the National Convention of Insurance Commissioners and enacted what is designated a "Model Rating Bureau Bill." Act 76, Acts of Michigan, 1915; Acts of Missouri, 1915, pp. 313-320; Laws of Pa. 1915, Act 401; Laws of Minn., 1915, chap. 101. These acts require all insurance companies to maintain or become a member of a rating bureau. The Arkansas act permits the companies to employ a common expert, but it does not require that any company shall employ such expert. The model bill adopted by these States contains a provision that the expenses of the bureau "shall be shared in proportion to the gross premiums received by each member during the preceding years, to which may be added a reasonable fee." The act under review, as we have seen, does not prescribe the manner in which the expenses shall be paid by the members of the bureau. But it was shown that the Arkansas Bureau adopted the same plan as that prescribed in the acts of those States adopting the model rating bureau bill. True, several of the States (Iowa, Oklahoma, Kentucky and Kansas) have enacted rating bureau bills which provide for deducting farm insurance premiums, and in some of them the premiums on other insurance, in making the assessment to meet the expenses of the bureau. But the fact that the method adopted by the Arkansas bureau is modeled after a bill that was recommended by the National Convention of Insurance Commissioners and enacted into law in several of the States is a cogent argument in support of the contention of the appellees that the method of the Arkansas bureau is not arbitrary and unreasonable.

The principal basis of appellant's contention, that premiums on farm business should not be taken into consideration in making the assessment for expenses, is that

the farm business is essentially different from urban business; that the companies who compete for that class of business operate a farm department, with men who devote a lifetime to farm insurance business in charge, and that the actuarial bureau rendered no services that are needed by a farm insurance business; that, on the other hand, the urban business requires that rates be made along scientific lines by experts who must consider each class of risk from the standpoint of "occupancy, exposure, protection, processes of manufacture," etc., elements that do not enter into consideration on farm property.

The testimony of the secretary tended to prove that the principal expense of the bureau was incurred in the inspection of urban property and the classification of the same in order to fix a basis of rates for insurance. On the other hand, the testimony of Speed tends to show that the bureau issued a general basis schedule for farm property, and that some service was furnished companies who were members and who were doing a farm, as well as an urban, business. His testimony showed that dwelling houses in cities and towns, like dwelling houses on farms, were not individually rated by the bureau, but were rated by the agents themselves by applying the basis schedule; that most of the risks in towns of less than five hundred people were not individually rated, and that therefore more than 50 per cent. of the risks in cities and towns were not so rated. It was shown that dwellings in cities and towns constituted about 35 per cent. of all the insurance; that farm insurance constituted 7 per cent.; that various other classes of risks in cities and towns, such as tornado, steam railway, per bale cotton contracts, cotton gins, etc., were not individually rated. So Speed testified that it was impossible, with respect to the service the bureau renders, to divide insurance into urban business on the one side, and farm business on the other. He stated that there was practically no difference between the situation of farm risks and the various other unrated risks so far as the service of the bureau was concerned.

He further testified that if premiums on farm business were excepted that it would logically follow that all other exceptions that received no benefit from the services of the bureau so far as specific rating was concerned would also have to be excepted, and that it was impossible to devise any plan of assessment that would enable the bureau to pro rate the expense of maintaining same according to the services actually performed to its various members.

(4)  Without pursuing the question of fact further, we are convinced that the method of making the assessments as adopted by the bureau was not an arbitrary and unreasonable discrimination against the appellant.  On the contrary, we are convinced that the evidence shows that the plan adopted was the fairest and most equitable that could have been devised when the interests of all the subscribers to the bureau were considered.  It is manifest that if exceptions were allowed on farm insurance, then exceptions would have to be allowed also on other classes of business similarly situated, or else the companies writing these other classes of insurance could claim that the assessment was an unjust discrimination as to them. Thus the plan of the organization for raising the necessary funds to meet its expenses and to preserve its efficiency would be subject to perpetual change, and the bureau could have no settled plan at all.  Any plan should have in view the interests not of one or a small number of subscribers doing a certain kind of insurance. but a plan that would operate most equitably upon all the subscribers. The plan adopted was within the discretion of the bureau, and appellant has no right to continue as a member therein and enjoy its benefits without conforming to the rules, which, so far as the proof shows, the remaining eighty-four members acquiesced in, as the best plan that could be established for maintaining the work of the bureau. The decree is therefore correct, and it is in all things affirmed.

McCULLOCH, C. J., and SMITH, J., concurring in the judgment.